Dan M. GRAY *v.* Nancy Coleman GRAY

02-524 101 S.W.3d 816

Supreme Court of Arkansas
Opinion delivered April 3, 2003

[Petition for rehearing denied May 15, 2003.*]

---

\* CORBIN, J., not participating.

*Ronald W. Metcalf, P.A.*; and *Hardin, Jesson & Terry, PLC*, by: *J. Rodney Mills*, for appellant.

*Jones, Jackson & Moll, PLC*, by: *Mark Moll*, for appellee.

ROBERT L. BROWN, Justice. Appellant Dan M. Gray appeals that part of the circuit court's divorce decree dealing with division of appellee Nancy Coleman Gray's pension plan and his retirement benefits.[1] He urges that it was clear error to value and divide Nancy Gray's pension plan based on contributions made rather than based on its present value. He further contends that a portion of his Civil Service Retirement pension should be exempted from division, because that portion is in lieu of Social Security benefits, which are not subject to division as marital property. We affirm the decision of the circuit court on both points.

On January 4, 1980, Dan Gray and Nancy Gray were married. Dan Gray was born on July 26, 1938, and was forty-one years old at the time of the marriage. Nancy Gray was born on January 11, 1950, and was twenty-nine years old when they married. Their age difference, accordingly, was about eleven-and-a half years.[2]

Dan Gray started working for the Internal Revenue Service during July of 1965 and continued working with the IRS until July of 2001. His retirement when married to Nancy Gray made her eligible for a guaranteed survivor's benefit, which could be waived by her but not by him. Nancy Gray is a special education teacher and has been since 1977. The Grays never had children, although Dan Gray has a daughter from a previous marriage.

The parties separated in early 1996. According to Nancy Gray's testimony, the relationship was always discordant. She filed a complaint for divorce on December 1, 2000, on grounds that she and Dan Gray had been separated for over eighteen months. Dan

---

[1] Nancy Coleman Gray has been using her maiden name, Coleman, since her divorce but, for ease of reference, she will be referred to as Nancy Gray in this opinion.

[2] Both Dan and Nancy Gray testified that she was age 27 and Dan Gray was age 38 when they married, but that does not correspond with their birthdates.

Gray answered, admitted the grounds, and asked the circuit court for an equitable division of the parties' marital property and debt. Later, Dan Gray filed a counterclaim for divorce and asserted his own grounds of eighteen-months separation and general indignities.

The parties accumulated substantial assets during their marriage, including a house and furnishings valued at $102,500; mineral interests on a section of real property; multiple checking and savings accounts at various banks; money market accounts; a certificate of deposit at Bank of the Ozarks valued at approximately $30,000; an AARP Capital Growth Fund investment valued at approximately $15,700; a Soloman Smith Barney account containing cash and shares of Wal-Mart, Acxiom, and Ozark Gas & Electric valued at approximately $380,000; various vehicles including a 1993 Pontiac Sunbird, a 1998 Ford Pickup, a 1997 Chevrolet Blazer, a Mazda Miata, and a boat, motor and trailer; liquidated sick leave accumulated by Dan Gray at the IRS worth $10,000; Individual Retirement Accounts of various amounts; and retirement plans (including plans not at issue in this case)[3]. Additionally, Dan Gray had nonmarital property assets, including a farm located near Paris, Arkansas, where he was living while the parties were separated. Nancy Gray stayed in the marital home in Fort Smith during the parties' separation and lengthy pre-divorce litigation.

The parties have two pension plans. Dan Gray participated in the federal Civil Service Retirement System benefit program throughout his career with the IRS. He now contends that a portion of his civil service pension benefits was given to him in lieu of Social Security. Since his retirement, he receives a monthly pension check in the amount of $4,033. At his death, Nancy Gray will receive the surviving spouse's benefit, which will be a monthly check from Dan Gray's civil service pension equal to fifty-five percent of his monthly pension entitlement, or $2,455. Dan Gray's retirement account with the federal government is fully vested, but under the Civil Service Retirement System law, he is not able to liquidate his retirement account and receive the amount that he has contributed to it.

Nancy Gray, on the other hand, has contributed throughout her career to a retirement account administered by the Arkansas

---

[3] Unless otherwise noted, the dollar amounts given in this opinion are approximate, as the circuit court noted in its decree.

Teacher Retirement System. She must wait until retirement to be able to draw a monthly retirement benefit. Her account is also fully vested, but she is able to liquidate her retirement account if she chooses and receive the value of her contributions made plus taxes. The Arkansas Teacher Retirement System was able to detail exactly how much Nancy Gray had contributed to her retirement account at the time of the divorce hearing. Her plan was described as a "defined-benefit plan."

At trial on October 15, 2001, Nancy Gray asked to be given $1,204 per month from Dan Gray's Civil Service Retirement System retirement check. That amount represented one-half of her marital-property portion (21/35ths, because the parties were married for 21 years out of the 35 that Dan Gray contributed to his retirement system) of Dan Gray's monthly retirement in the amount of $4,033. She also asked the court to include language in the decree to secure for her the "former spouse survivor annuity" in an amount of $2,455. With respect to her own pension plan, Nancy Gray stated that she had no objection to the court's awarding Dan Gray his proportionate interest in her pension benefits when she began receiving them. She also argued that *Skelton v. Skelton*, 339 Ark. 227, 5 S.W.3d 2 (1999), where this court held that a portion of a contractual fireman's retirement benefit plan that replaced Social Security was included in the marital estate, foreclosed any attempt by Dan Gray to exempt the Social Security replacement portion of his retirement pay.

Nancy Gray also testified that her income from her day job teaching for the school district netted her approximately $48,000 a year, and that her income from part-time tutoring of disabled children amounted to around $2,000 a year. She told the court that her expenses outstripped her income by a considerable amount.

She added that she had worked for the school system for twenty-four years, twenty-one of which she was married to Dan Gray. She testified that she had contributed to the pension plan every year of her employment except for four years, when she paid approximately eight thousand dollars in dental work for her husband, which ordinarily would have been paid into her retirement plan.

With respect to when she would retire, she stated that she knew that her retirement system allowed her to begin drawing

monthly retirement benefits after twenty-eight years with the school system, which would put her age at fifty-nine. Other testimony established that her monthly retirement benefit, if she retired at the minimum age of fifty-nine, would be approximately $1,872.39. She maintained, however, that she intended to work until she was sixty-five or sixty-seven years old (the date of social-security and medicare eligibility), because her health insurance premium was $457 a month and she needed Medicare protection.

When asked about Dan Gray's proposal to reduce the future value of her retirement account to present value and divide that amount by one-half, she said: "I will be penalized by doing it the way that he wants to do it. He wants to project my fifty-three or thirty-five thousand dollars to a hundred and seventy-one thousand and me give him half my assets, current assets at this time." She admitted that because her retirement plan was a defined-benefit plan, if she died between the time of the divorce and the time of retirement, the benefits would pass to no one.

Dan Gray argued on the other hand that the age difference between Nancy Gray and him made her proposed division of the pension plans fundamentally unfair. He contended that if the circuit court adopted her proposal that, based on the actuarial tables predicting his and her life spans, he would only enjoy the marital part of her retirement plan for approximately eight years. By contrast, if she survived to her life expectancy, she would enjoy payments under his pension plan for over thirty-one years. He asked the court to reduce her pension to present value of what she will receive in retirement benefits and give him an immediate payment of one-half of that amount. Dan Gray also argued that it would be unfair not to offset the Social Security replacement portion of his retirement pay and not consider that marital property, since Nancy Gray had social security benefits which were off-limits for the purpose of dividing the marital property.

Donna Young, a certified financial planner for Morgan Stanley, testified at trial as an expert for Nancy Gray. She stated that the liquidated value of Nancy Gray's pension account would be approximately $55,000. When asked about the methods used by Dan Gray's expert, Dr. Robert Marsh, and the results he obtained, she stated that the assumptions made by Dr. Marsh were faulty. First, she stated that Dr. Marsh assumed that her client would retire at her earliest opportunity, age fifty-nine, when it was not

likely in her opinion that she would do so until age sixty-five or sixty-seven because of the high cost of medical insurance.

Ms. Young stated that a valuation of Nancy Gray's pension plan using an "immediate offset" method, which would reduce the future value of her pension account to present value and give Dan Gray one-half of its value, would be unfair to her client, because she may not receive the full benefit of her pension plan due to a premature death. She added that a second method that could be used to divide the property equitably would be to let each party simply collect his or her own pension, and the non-owning spouse would receive one-half of the amount received. This method is known as the "deferred distribution method." Under this method, she calculated that Nancy Gray would receive $1,203.85 per month until Dan Gray died, and then the survivor benefit would activate, and she would receive approximately $2,455 per month.

Ms. Young testified about the financial interest that both parties had in advocating their proposed methods of valuing Nancy Gray's pension plan. She testified that it would be in Dan Gray's interest, because of the age discrepancy between them, to use present value calculations and ask for an immediate distribution, but not in Nancy Gray's interest due to the possibility of her premature death. She said, with respect to Nancy Gray's premium plan, " . . . if Nancy were to quit today and collect her money that she has in her plan which is fifty-five thousand, then half of that could be used today to offset Nancy's future pension benefits." She went on to say that Dan Gray would receive, under that method, one-half of eighty-nine percent of the value of the current value of her retirement account. (The eighty-nine percent was used because she was married to Dan Gray for eighty-nine percent of the time that she had worked for the school system.) In return, she would be entitled to the marital portion of Dan Gray's retirement benefits that he was currently receiving, followed by the surviving spouse benefit when he died. She concluded: "I'm not sure why [Nancy Gray] should be penalized for the age discrepancy." With respect to the effect of the age difference on the marital distribution, she added: "[T]hat was a decision that they both made when they got married. They knew they were eleven years different in ages and I know that it may be unfair that Dan has to wait, but Nancy shouldn't be penalized for that."

Dr. Robert E. Marsh, an economist, testified for Dan Gray by way of deposition and gave his opinion on how the parties' pensions might be equitably divided. He first testified that the full monthly retirement benefit that Dan Gray would receive was approximately $4,464 per month.

He further stated that he had calculated the present value of Nancy's pension plan using data provided by the Arkansas Teacher Retirement System. Under his calculations, Dan Gray would be expected to live approximately seventeen years from the date of the hearing, and Nancy Gray would be approximately seventy years old when he died. Dr. Marsh also provided some calculations that treated a portion of Dan Gray's retirement benefit as being equivalent to Social Security. With respect to the age difference of the parties, he testified:

> I don't think Dan Gray is going to be able to draw anything on Nancy Gray's teacher retirement benefit unless she predeceases him. Her life expectancy is so much longer. . . . She has an additional thirty years of life expectancy in comparison to Dan's life expectancy of seventy years, so the likelihood of her predeceasing Dan is slim and none, which means that he is not going to be eligible for any sort of retirement benefit out of the Arkansas Teacher Retirement System. . . .

On October 22, 2001, the circuit court issued a letter opinion. The opinion first granted Nancy Gray a divorce based on the eighteen-month separation and usage of her maiden name, Coleman. The opinion next divided the parties' property. The court's reasoning regarding the valuation of Nancy Gray's pension largely followed the recommendation of Ms. Young:

> The current value of Nancy Coleman Gray's pension plan is $55,321. Testimony indicated that 21.5/24 of the pension plan is marital property. Ordinarily, a division using this figure would be very beneficial to the Plaintiff and accordingly very unfavorable to the Defendant. However, considering the age difference of the parties, the Court has determined that this is how I should divide the Plaintiff's pension. The Court is awarding the Defendant one-half of $55,321.00 or $27,660.50. This award will be made by adjusting the division of the IRA accounts later in this letter opinion so that as far as the Plaintiff and her pension plan are concerned, she will receive it in its entirety. Because a division of this nature is extremely advantageous to the Plaintiff, the

Court is dividing 100% of the current value of the pension rather than 21.5/24, or 89%.

The opinion also directed that Nancy Gray be named the beneficiary of the surviving spouse's benefit at the time of Dan Gray's death, in order to allay her fears of the benefit's being challenged if he remarried.

The opinion explained the circuit court's reasoning on the division of Dan Gray's pension. The opinion stated that his monthly benefit from his Civil Service Retirement System pension was $4,033 per month and recognized that Nancy Gray's request of a percentage of his Civil Service pension, or $1,204 per month, was based on their years of marriage. The court noted that the value of the pension payment would be approximately $4,440 per month but for the cost of funding the future survivor's benefit. The court held that the amount that it took to fund the survivor's benefit, approximately $407 a month, should be deducted from the amount that Dan Gary was required to pay. This led the court to the conclusion that Nancy Gray should be paid $797 per month.

The court then explained its belief that this division of property balanced the equities in the case:

> The Court recognizes that by deducting the $407.00 from Plaintiff's requested $1,204.00 per month, the Defendant is benefitted by approximately $121.00 per month. However, based on the Court's division of the Plaintiff's pension which is extremely beneficial to the Plaintiff, this benefit to the Defendant is equitable. . . . I divided the pension this way to address the Defendant's concerns about the age difference of the parties, the Plaintiff's anticipated retirement date, and the parties' life expectancies.

Ultimately, the court determined that Nancy Gray was to pay $25,137.27 to Dan Gray to make the accounts divide evenly. A decree was entered later reflecting the findings and conclusions of the letter opinion.

## I. Nancy Gray's Pension Plan

The first issue on appeal is whether the circuit court's decision to award Dan Gray one-half of the current value of Nancy Gray's pension plan, based on her contributions as opposed to the present value of full pension benefits, was clearly erroneous.

■■ This court has previously discussed the standard of review for the division of property in a divorce case:

> On appeal, chancery cases, such as divorces, are reviewed *de novo*. With respect to the division of property in a divorce case, we review the chancellor's findings of fact and affirm them unless they are clearly erroneous, or against the preponderance of the evidence; the division of property itself is also reviewed, and the same standard applies. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. In order to demonstrate that the chancellor's ruling was erroneous, an appellant must show that the trial court abused its discretion by making a decision that was arbitrary or groundless. We give due deference to the chancellor's superior position to determine the credibility of witnesses and the weight to be given their testimony.

*Skokos v. Skokos*, 344 Ark. 420, 425, 40 S.W.3d 768 (2001) (citations omitted).

■■ The Arkansas marital-property statute requires that marital property be divided evenly between the parties unless the circuit court finds that such a division would be inequitable. Ark. Code Ann. § 9-12-315(a)(1)(A) (Repl. 2002). If the circuit court decides that an even division is inequitable, it is required to make a written finding to that effect and explain its reasoning. Ark. Code Ann. § 9-12-315(a)(1)(B) (Repl. 2002). The statute lists nonexclusive factors that the circuit court may consider in modifying an even distribution, including the length of the marriage; the age, health, and station in life of the parties; the occupation of the parties; the amount and sources of income available to the parties; the parties' vocational skills; their employability; the estate, liabilities, and needs of each party; the opportunities before them to acquire further assets and income; and the parties' past contributions in the acquisition and maintenance of marital property. Ark. Code Ann. § 9-12-315(a)(1)(A)(i)-(vii) (Repl. 2002). "Marital property" includes payments made under a deferred compensation plan and individual retirement accounts as well as survivor benefits. Ark. Code Ann. § 9-12-315(b)(1) (Repl. 2002); *see also Skelton v. Skelton*, 339 Ark. 227, 231, 5 S.W.3d 2, 4 (1999).

■ The issue before us is what method should be used to value Nancy Gray's pension. This case deals with the valuation of a vested pension plan, which is a type of retirement plan. *See*

*Black's Law Dictionary* 115 (7th ed. 1999) (defining "pension" as "A fixed sum paid regularly to a person (or to the person's beneficiaries) esp. by an employer as a retirement benefit.") There are two relevant types of retirement plans:

> If the employee's benefits are defined as a certain amount per period of time, the plan is known as a *defined benefit plan*. It is not necessary that the amount of the benefit be known, and many plans compute this amount using a formula. By contrast, if the employee and the employer both make contributions to a retirement plan account, and the employee's benefits are expressed in terms of the present balance in his account, the plan is known as a *defined contribution plan*.

Brett R. Turner, *Equitable Distribution of Property* § 6.02 at 289 (2nd ed. 1994) (emphasis in original). Turner further notes:

> While a defined contribution plan expresses the employee's interest in terms of the balance remaining in the plan account, the employee need not necessarily receive his or her interest in that form. Many defined contribution plans use the balance in the plan account on the date of retirement to purchase an annuity, which will yield periodic benefit for the employee's entire remaining lifetime. The distinction between defined benefit and defined contribution plans therefore lies in how the plan benefits are defined *before* retirement, and not in the form in which the benefits are received after retirement.

Turner, *supra*, § 6.02 at 289 n.4 (emphasis added) (citations omitted).

■ There are several ways of valuing a pension plan. One is the "immediate offset" method, which is advocated by Dan Gray in this case and which consists of reducing the lifetime value of the pension benefits to present value and awarding the marital share of that present value to the non-owning spouse in the form of cash or other property. Turner, *supra*, § 6.11 at 347. The other method is the "deferred distribution" method, where the trial court does not divide the pension immediately but instead determines a percentage of the monthly pension benefit that the non-owning spouse is entitled to; the non-owning spouse then enjoys that share when the owning spouse begins drawing retirement. Turner, *supra*, § 611 at 347.

The Connecticut Supreme Court has outlined the advantages and disadvantages of both methods:

The offset method has the advantage of effecting a "clean break" between the parties. It also avoids extended supervision and enforcement by the courts.

The drawback to the offset method is that it places the entire risk of forfeiture before maturity on the employee spouse. Further, this method is not feasible when there are insufficient other assets by which to offset the value of the pension; or where no present value can be established [by expert testimony] and the parties are unable to reach agreement as to the value of the pension. If there are sufficient other assets, however, several courts have favored this approach.

. . . .

Alternatively, under the "reserved jurisdiction" method [or deferred distribution method], the trial court reserves jurisdiction to distribute the pension until benefits have matured. Once matured, the trial court will determine the proper share to which each party is entitled and divide the benefits accordingly.

Both the present division and reserved jurisdiction methods have the advantage of imposing on the parties equally the risk of forfeiture, but have the cost of prolonging the parties' entanglement with each other. These methods are favored when there are insufficient assets to offset the award of the pension to the employee spouse alone or when the evidence is inadequate to establish present value.

*Krafick v. Krafick*, 234 Conn. 783, 802-804, 663 A.2d 365, 374-375 (1995) (citations and quotations omitted).

■ The proper method for valuing a defined-contribution plan is by ascertaining the current account balance, or "total contributions." As long as the court recognizes appreciation in prior contributions, the total-contributions method can properly be used to value a defined-contribution plan. Turner, *supra*, § 6.12 at 374-375.

■ Mr. Turner in his treatise notes that, although it is generally disfavored, the total-contribution method of determining value is proper in an appropriate defined-benefit plan case. "When there is no better evidence in the record, the number of decisions reluctantly accept a value based upon the total contributions method." Turner, *supra*, § 6.12 at 374 (citing *Addis v. Addis*, 288 Ark. 703 S.W.2d 852 (1986)). As Mr. Turner notes, our court has seen fit to use the total-contributions method in an appropriate case. *See Addis v. Addis, supra.* In *Addis*, this court

observed that the total-contribution method chosen was a sound alternative under the facts of that case:

> Three basic methods are available for disposing of vested but non-matured retirement interests upon divorce: (1) assign the whole of the interest in the plan to the employee, and assign assets of equivalent value to the other spouse; (2) divide the interest in the plan itself on a percentage formula; and (3) reserve jurisdiction until retirement to divide the actual monetary benefit when received. *See* B. Goldberg, Valuation of Divorce Assets, § 9.5 at 254. The chancellor chose the first method, an appropriate method. The appellant does not question the method, but instead questions the valuation. However, at trial no actuarial valuations were offered. The trial court could value the rights only upon the evidence presented, which was the amount of cash that appellant had contributed to the fund at the time of the hearing. We affirm the trial court's action.

*Addis*, 288 Ark. at 207-208, 703 S.W.2d at 854. In the case before us, however, Dan Gray did present ample evidence of the value of the plan reduced to present value, which distinguishes the facts in this case from the facts in *Addis*.

Hence, the question becomes whether the circuit court abused its discretion in treating Nancy Gray's pension as a defined-contribution plan. In other words, was the circuit court's decision arbitrary or groundless?

We conclude that from the testimony presented at trial, Nancy Gray's pension plan could be considered a defined-contribution plan. First, Nancy Gray testified that she would be able to liquidate the pension and receive exactly what she contributed to it. Indeed, she referred to the retirement plan as if it were an account, which is indicative of a defined-contribution plan, rather than speaking in terms of a specific benefit tied to a period of time in the future, which is indicative of a defined-benefit plan. Secondly, the Arkansas Teacher Retirement System was able to tell her precisely how much she personally had contributed to her plan, which makes the plan appear to be more like an account and hence a defined-contribution plan. Nancy Gray did testify that she would not be allowed to withdraw a monthly retirement check until she had been employed with the school system for twenty-eight years, but this is relevant only to how the plan is treated *after* retirement, which, as Mr. Turner notes in his treatise,

is not relevant. The question is how the plan is treated *before* retirement. On the other hand, running contrary to this reasoning is the Arkansas Teacher Retirement System's letter, which states that her plan is a "defined-benefit program."

 The circuit court's opinion specifically stated that the total contribution method was used *because* of the age difference between the parties. In deciding as it did, the court met Dan Gray's concern about the length of his enjoyment of her pension fund by giving him an immediate cash benefit in the amount of half of the current value of her pension contributions. Dan Gray, after all, requested an immediate payment of value, although he advocated a division of present value, not total contributions. A rough estimate of the present value of Nancy Gray's pension plan, according to Dr. Marsh, was approximately $173,000, meaning he would be entitled to approximately $87,000 from her marital estate. This offset would have reduced Nancy Gray's assets considerably. Plus, as the circuit court noted, there was no assurance that she would live to full life expectancy and be able to enjoy full retirement benefits. We conclude that the circuit court exercised its discretion in a good-faith effort to balance the equities of the case. The circuit court's decision was not arbitrary; nor was it groundless. There was no abuse of discretion by the court.

## II. Dan Gray's Pension Plan

Dan Gray next asserts that $1,365 of the $4,033 received each month as his retirement benefit under his Civil Service Retirement System pension is paid to him in lieu of Social Security benefits. He points out that the reason that he does not receive Social Security benefits is because he participates in the Civil Service Retirement System, and participants in that program are foreclosed from receiving benefits under Social Security. He argues that it would be unfair not to exempt this portion of his pension which corresponds to Social Security benefits.

Nancy Gray contends, in opposition, that Dan Gray had a choice of whether to enter the Civil Service Retirement program or the Federal Employees Retirement System, which includes Social Security, and that she should not be penalized because of his choice. She again emphasizes the circuit court's balancing of the equities in this case, which involved considerable assets accu-

mulated over a lengthy period of marriage and separation. She argues that Arkansas case law controls this case, specifically *Skelton v. Skelton, supra,* and that Dan Gray's argument urges this court to adopt the reasoning in cases that this court has specifically rejected. She also points out that the United States Congress has provided for the treatment of civil service pensions as marital property and has refused to exempt them in the same way that Social Security has been exempted. She claims that this lack of action is indicative of Congressional intent and implies that the adoption of Dan Gray's position may well violate the Supremacy Clause of the United States Constitution.

 Our standard of review is *de novo,* as the issue involves a legal conclusion by the circuit court that the pension benefits were part of the marital estate under the Arkansas marital property statutes. *See Hodges v. Huckabee,* 338 Ark. 454, 995 S.W.2d 341 (1999). Moreover, we believe that there is an Arkansas case directly on point. In *Gentry v. Gentry,* 282 Ark. 413, 668 S.W.2d 947 (1984), this court treated a federal employee's civil service retirement pension as marital property. There, the wife of a former administrative law judge for the Social Security Administration claimed a marital interest in her husband's civil service retirement benefits. The trial court held that the pension plan was not marital property, and this court reversed, stating:

> The husband's retirement plan is subject to division. Congress has wisely anticipated that this treatment would be given by the various state courts (see 94 A.L.R.3d 176) through the passage of 5 U.S.C.A. § 8345(j)(1) (1976), to wit:
>
> > Payments under this subchapter which would otherwise be made to an employee, Member or annuitant based upon his service shall be paid (in whole or in part) by the Office to another person if and to the extent expressly provided for in the terms of any court decree of divorce, annulment, or legal separation, or the terms of any court order or court-approved property settlement agreement incident to any court decree of divorce, annulment or legal separation. Any payment under this paragraph to a person bars recovery by any other person.
>
> By holding these retirement benefits to be marital property, we are not laying down a rigid and inflexible rule for the future. § 34-1214 expressly provides for equal distribution "unless the court finds such a division to be inequitable." Any exception to

the rule of equal distribution will always depend upon the specific facts as reflected by the trial court's findings and conclusions.

*Gentry*, 282 Ark. at 414–415, 669 S.W.2d at 948. *See also McDermott v. McDermott*, 336 Ark. 557, 562, 986 S.W.2d 843, 845 (1999) (recognizing that in *Gentry*, "we held that a husband's civil service retirement benefits were marital property subject to distribution."). This court thus held in *Gentry* that under the congressional act, a trial judge is permitted to consider Civil Service Retirement benefits as marital property, if appropriate under the equities of the specific case.

▆▆▆ The United States Code section cited in our *Gentry* decision, although it was amended by Congress in 1994, nevertheless appears to apply to the case at hand as well. The pertinent section which governs Civil Service Retirement reads:

(j)(1) Payments under this subchapter which would otherwise be made to an employee, Member, or annuitant based on service of that individual shall be paid (in whole or in part) by the Office to another person if and to the extent expressly provided for in the terms of—

(A) any *court decree of divorce*, annulment, or legal separation, or the terms of any court order or court-approved property settlement agreement incident to any court decree of divorce, annulment, or legal separation . . . . (emphasis added).

5 U.S.C. §8345(j)(1) (2000). The circuit court's divorce decree expressly provided that the payments to be made to Dan Gray, a member of the Civil Service Retirement System, should be made in part to Nancy Gray. The decree thus falls directly within the purview of the statute.

Moreover, in *Skelton v. Skelton, supra*, this court rejected an argument that a fireman's pension fund was deserving of the same protection as Social Security and instead held that the pension was marital property. In *Skelton*, the husband had been a Fayetteville firefighter for approximately thirty years at the time of the divorce and had contributed to a relief and pension fund during his employment. Under the terms of the plan, the husband was not allowed to contribute to Social Security. He was thus ineligible for Social Security benefits and was covered only by the fireman's pension plan. The trial court held that the pension benefit was

marital property and awarded his ex-wife half of the marital por-tion of his retirement benefit.

On appeal, the husband argued that the retirement benefit was made in place of Social Security benefits and, therefore, should be treated the same as Social Security and exempted from the marital estate. This court disagreed:

> We recognize that Mr. Skelton appears to be placed at a dis-advantage because he was prohibited from contributing to social security under his fireman's pension plan; however, the minority view on which he relies does not take into account the funda-mental difference between social security and pension plans. A Florida court makes this distinction in *Johnson v. Johnson*, 726 So.2d 393 (Fla.Dist.Ct.App.1999). Florida's equitable distribu-tion statute provides that "[a]ll vested and non-vested benefits, rights, and funds accrued during the marriage in retirement, pen-sion, profit-sharing, annuity, deferred compensation, and insur-ance plans and programs are marital assets subject to equitable distribution." Fla. Stat. Ann. § 61.076(1) (West 1997). In *Johnson*, the court held that the husband's social security replacement plan was a marital asset. *Id.* The *Johnson* court, persuaded by the deci-sion in *Mack v. Mack*, supra, further reasoned that social security replacement pension plans were not so similar to federal social security benefits as to render them exempt from the Florida statutes.

> In the *Mack* case, the Wisconsin Court of Appeals provided the following rationale:

>> Although an employee's social security account increases in relative value over his working life, social security is not a property like a pension. It is a system of social insurance. 'To engraft upon the social security system a concept of accrued property rights would deprive it of the flexibility and bold-ness in adjustment to ever-changing conditions which it demands.'

> *Id.* (citing *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

> Since the courts are divided on this issue, we further examine the purposes behind social security benefits and pension plans. In the United States Supreme Court case of *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979), a railroad-benefits case, the Court discussed the contractual nature of pension plans vis-a-vis the noncontractual nature of social security. Writing for the majority, Justice Blackmun states:

> Like Social Security, and unlike most private pension plans, railroad retirement benefits are not contractual. Congress may alter, and even eliminate, them at any time. This vulnerability to congressional edict contrasts strongly with the protection Congress has afforded recipients from creditors, tax gatherers, and all those who would 'anticipate' the receipt of benefits. . . .

*Id.* The possibility of changes in benefits is expressly stated in the Social Security Act: "The right to alter, amend, or repeal any provision of this [Act] is reserved to Congress." 42 U.S.C. § 1304 (1994). This language emphasizes the difference between social security benefits and pension plans. As the *Mack* case points out, social security benefits are a type of public welfare, or social insurance. Social security benefits provide revenue or income; however, social security is not contractual in nature and does not become a property interest. It is subject to change by congressional act at any time.

According to *Hisquierdo*, most private pension plans are contractual agreements between the employer and employee. In Mr. Skelton's case, the contributions to his pension plan were made during the marriage and became a property interest during the marriage. *See* Ark. Code Ann. § 9-12-315; *Day, supra.* Mr. Skelton's pension was not designed to replace noncontractual social security benefits; rather, it provided a pension benefit which exceeded that of the social security system. We note that Ms. Skelton, by foregoing compensation which would otherwise have been received during marriage, contributed indirectly to the pension plan. Because the purposes of social security and the retirement plan are fundamentally different, they are not interchangeable. Therefore, we affirm the trial court on this issue.

*Skelton*, 339 Ark. at 232-234, 5 S.W.3d at 4-5.

 Dan Gray urges that the *Skelton* case is distinguishable because (1) the firefighters' plan was contractual, and (2) in *Skelton*, the non-owning spouse would not receive Social Security. We disagree that those factors render *Skelton* inapposite precedent. The essence of the *Skelton* decision is that pension plans differ from Social Security, which is more in the nature of public welfare or social insurance. The Civil Service Retirement pension, albeit established by congressional act, establishes a pension plan and is not social insurance. The policies governing the two programs are

entirely different. Moreover, our case law is clear, as evidenced by the *Gentry* and *McDermott* decisions discussed earlier in this opinion, that the circuit court had statutory authority to divide Civil Service Retirement benefits. Congress could easily decide that Civil Service Retirement benefits should not be subject to division as marital property. It has not done so.

As for Dan Gray's characterization of Nancy Gray's receipt of both Social Security and retirement benefits as "unfair," he made a choice to contribute to the Civil Service Retirement System rather than Social Security, and the Civil Service Retirement System provided more benefits. Moreover, he had a chance to convert his retirement system over to a Social Security eligible system in 1982. He testified that he studied the matter and decided not to join the new plan.

We cannot say the circuit court abused its discretion in ruling as it did.

Affirmed.

CORBIN, J., dissents.

DONALD L. CORBIN, Justice, dissenting. I dissent from that part of the majority opinion that views all of Dan Gray's pension as marital property, even that portion that is in lieu of social security benefits. It is irrelevant that the benefits are not actually labeled social security, as they are the equivalent of social security benefits. Thus, because social security benefits are exempted from the definition of marital property, equivalent benefits should likewise be exempted. There is no logical reason to treat such benefits differently.

The majority opinion distinguishes these benefits by label, but not by substance. This distinction, or lack thereof, results in an inequitable division of property. In my dissent in *Skelton v. Skelton*, 339 Ark. 227, 5 S.W.3d 2 (1999), I urged this court to adopt the approach used by the courts in Ohio and Pennsylvania, which have held that because social security benefits are exempted from marital property, a spouse who receives a pension but no social security benefits may be entitled to have exempted from the marital property that portion of the spouse's pension that might

figuratively be considered in place of social security benefits. The rationale behind this approach is best stated in *Cornbleth v. Cornbleth*, 580 A.2d 369, 371-72 (Pa. Super. 1990) (emphasis added):

> One of our goals with regard to equitable distribution must be to treat different individuals with differing circumstances in a fashion so as to equate them to one another as nearly as possible, thus, eliminating a bias in favor of, or against, a class of individuals. To the extent individuals with Social Security benefits enjoy an exemption of that "asset" from equitable distribution we believe those individuals participating in the [civil service retirement programs] must, likewise, be so positioned. Consider for example an individual being divorced at approximately age fifty. Assuming a normal work history, that person will likely have accrued a substantial pension as well as a right to Social Security. When the pension is divided in equitable distribution there will. be a diminution of the expected retirement income. However, the presence of Social Security will help offset the diminution. *In contrast, an individual who was a civil service participant for many years will, if the trial court's approach is approved, be dealt a double blow of sorts. The pension will become part of the marital estate and, thus, divided, yet there will be no Social Security benefit waiting to cushion this financial pitfall.*

Here, by participating in the Civil Service Retirement System, Dan is being dealt a double blow. His pension is divided between he and Nancy, and while Nancy has social security to bolster her retirement funds, Dan is without this benefit. In my opinion, the majority is misguided in relying on the fact that Dan chose to participate in this particular retirement plan, instead of one that would have left his social security benefits intact. As the majority's opinion notes, the plan that Dan chose provided more benefits. Thus, Dan's choice benefitted both he and Nancy. By holding as it does today, this court is effectively forcing Dan to pay the price for having made a choice that benefitted both of them. This, in my opinion is patently unfair.

In sum, lest my position on this matter be misunderstood, I believe that social security benefits and their pension equivalents should be off limits to divorcing spouses and should never be considered marital property. For this reason, I respectfully dissent.